Shaw & Keeter Motor Company v. Commissioner.
Shaw & Keeter Motor Co. v. Commissioner
Docket No. 26977.
United States Tax Court
1951 Tax Ct. Memo LEXIS 138; 10 T.C.M. (CCH) 716; T.C.M. (RIA) 51235; August 16, 1951
James P. Hill, Esq., Atlantic Nat. Bk. Bldg., Jacksonville, Fla., and William R. Frazier, Esq., for the petitioner. F. L. Van Haaften, Esq., and Ralph V. Bradbury, Jr., Esq., for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income, declared value excess profits, and excess profits taxes, and section 102 surtaxes for the fiscal years ended October 31, 1944, through 1948, as follows: Fiscal
Declared Value
Year
Income
Excess-Profits
Excess-Profits
Section 102
Ended
Tax
Tax
Tax
Surtax
10/31/44
$92.40
$1,231.31
$ 8,129.03
10/31/45
1,196.37
7,134.99
10/31/46
$443.10
200.05
16,609.00
10/31/47
532.00
21,121.48
10/31/48
532.00
16,578.84
*139 The only issue for decision is whether the Commissioner erred in holding the petitioner subject to surtax under section 102 for improperly accumulating surplus. Another issue raised by the petitioner was conceded by the petitioner at the hearing. Findings of Fact The petitioner is a Florida corporation which filed its returns for the taxable years with the collector of internal revenue for the district of Florida. It used an accrual method of accounting and filed its returns on the basis of a fiscal year ended October 31. The petitioner was incorporated by D. A. Shaw and P. C. Keeter in 1924 for the purpose of operating a retail Ford automobile agency. It has been engaged ever since that time in buying, selling, and servicing new and used automobiles and trucks. The business has been located in and has been the only Ford agency in Gainesville since 1924. The nearest Ford dealer is about 16 miles from Gainesville, while the nearest dealer of comparable size is about 37 miles away. Five other agencies in Gainesville sell cars in the same price class as those sold by the petitioner. It has had franchises to sell Ford and Lincoln automobiles since 1924, and in 1937 received a franchise *140 to sell Mercury automobiles. Its franchises are not exclusive. Shaw died in 1930, and at that time his widow became the record owner of his stock in the petitioner corporation. Keeter is unmarried and has no children. The active management of the business has been in his hands since Shaw's death. Mrs. Shaw, Keeter, and Mrs. Shaw's daughter, Elizabeth McClamrock, were president, vice president, and secretary, respectively, of the petitioner and comprised its board of directors during the years involved herein. Mrs. Shaw is now about 76 years of age. The 500 outstanding shares of the petitioner's stock had a par value of $100 each and were held during the taxable years as follows: 10/31/44
10/31/45
10/31/46
10/31/47
10/31/48
P. C. Keeter
250
250
250
250
250
Mrs. D. A. Shaw
249
249
249
229
229
Elizabeth Shaw McClamrock
1
1
1
1
1
Minnie Sparks (sister of
P. C. Keeter
10
10
C. P. Keeter
10
10
Keeter used the petitioner as a bank for his personal funds and usually had a substantial credit balance due him. The credit balances represented undrawn salary and dividends and personal funds which Keeter deposited with *141 the petitioner. The petitioner never paid Keeter any interest on the money due him. Mrs. Shaw frequently borrowed money from the petitioner without interest or security, the loans being approved by Keeter. The balances due Keeter from the petitioner and the amounts due the petitioner from Mrs. Shaw as of October 31 during the years 1942 through 1948 were as follows: Due Keeter
Due Petitioner
from Petitioner
from Mrs. Shaw
1942
$32,115.46
$10,516.42
1943
11,507.68
10,358.37
1944
50,736.00
13,983.03
1945
62,129.76
19,080.40
1946
45,669.23
20,990.15
1947
65,472.69
22,848.63
1948
19,420.08
31,784.91
Keeter owned more than $200,000 in securities during the years involved herein. The petitioner's net sales, net income after taxes, dividends paid, and earned surplus for the taxable years were as follows: Fiscal
Year Ended
Net Income
Dividends
Earned
October 31
Net Sales
After Taxes
Paid
Surplus
1944
$359,670.80
$29,825.36
$283,445.50
1945
481,620.89
33,244.74
$ 4,000
312,936.99
1946
749,170.39
71,511.42
10,000
374,815.08
1947
921,438.86
91,937.39
16,000
450,951.19
1948
980,157.43
75,418.68
16,000
510,369.87
*142 The only other dividends paid were $13,000 in 1937, $12,500 in 1938, and $4,000 in each of the years 1942 and 1943. The additional surtax liability which the stockholders would have incurred had the petitioner declared dividends to the full extent of its earnings would have been as follows: Keeter
Mrs. Shaw
All Others
1944
$ 9,268.91
$ 7,180.30
1945
8,676.47
7,080.44
1946
18,947.49
16,787.59
1947
25,511.24
20,658.22
$810.24
1948
18,385.91
14,402.43
884.50
The petitioner's balance sheets for the end of each taxable year were as follows: ASSETS
October
October
October
October
October
31, 1944
31, 1945
31, 1946
31, 1947
31, 1948
Cash
$236,117.20
$231,782.01
$249,204.11
$294,986.60
$184,665.13
Notes and Accts. Receivable
33,271.88
68,753.60
114,953.30
100,170.13
118,222.00
Inventories
35,961.37
39,600.74
52,213.93
109,597.55
176,272.42
Investments - (Gov't. Obl.)
69,400.00
94,400.00
94,400.00
94,400.00
94,400.00
Investments - (Other)
24,900.00
Depreciable assets, real estate, and
other miscellaneous assets
57,665.67
57,929.02
57,393.62
61,775.23
85,877.77
Totals
$432,416.12
$492,465.37
$568,254.96
$660,929.51
$684,337.32
LIABILITIES
Accounts payable
72,114.70
86,760.04
80,807.66
94,902.45
69,638.08
Deferred income and accrued expenses
3,203.26
3,371.04
8,852.92
8,727.16
8,381.58
Federal income and excess profits taxes
23,652.66
39,397.30
53,779.30
56,348.71
45,947.79
Capital stock
50,000.00
50,000.00
50,000.00
50,000.00
50,000.00
Earned surplus
283,445.50
312,936.99
374,815.08
450,951.19
510,369.87
Totals
$432,416.12
$492,465.37
$568,254.96
$660,929.51
$684,337.32
*143 The petitioner has always endeavored to finance its sales of automobiles and trucks with its own funds. This practice has contributed in a large measure to the petitioner's success, since it financed on terms that regular finance companies were either unable or unwilling to meet. The average length of time that a customer's note is in existence is 21 months and the average down payment is approximately one-third. Most of the sales during the first three taxable years were for cash, but normally credit is extended in approximately 75 per cent of the sales. The manufacture of automobiles and trucks was greatly curtailed during the war and, consequently, the petitioner's sales of both new and used vehicles decreased after 1941. It sold 365 new and 944 used vehicles in 1941, whereas in 1944 and 1945 its total sales amounted to 26 and 38 vehicles. The petitioner anticipated that its supply of automobiles would return to normal after the war, but during the years involved herein the Ford Motor Company was unable to supply the petitioner with anything approximating its pre-war quotas. The petitioner sold 163 new cars in 1946, 250 in 1947, and 207 in 1948. It could have sold many more *144 cars than it received. Cars are received from Ford on an allotment basis, the allotment being based on the population of the dealer's area and the comparative sales records of the dealer and his competitors. The Ford automobile potential assigned to Gainesville by the manufacturer for 1950 was 600 units. Between 375 and 400 new cars were sold by the petitioner in that year. The petitioner's franchise with the Ford Motor Company required it to maintain an inventory of new vehicles of 8 to 12 per cent of its retail deliveries during the preceding 12 months and an inventory of parts equal to one-sixth of its sales during the preceding 12 months. It has been impossible since 1941 for the petitioner to comply with this requirement. Ford has neither enforced nor waived the requirement since 1942. The petitioner maintained parts and accessory inventories during the taxable years 1947 and 1948 substantially greater than required by Ford. It invested heavily in and carried on a profitable parts business during the war years. The Shaw & Keeter Finance Company, a partnership, was formed on April 1, 1941, with capital furnished in equal parts by Keeter and Mrs. Shaw to take over the financing *145 activities of the petitioner. Charges totaling $80,000 were entered on the petitioner's books to the accounts of Keeter and Mrs. Shaw, who had large credit balances owing them from the petitioner at that time. Keeter gave one-half of his 50 per cent interest in the partnership to his sister, and Mrs. Shaw divided one-half of her 50 per cent interest equally among her three daughters. The petitioner thereafter sold to the partnership most of its customers' notes at an 8 per cent per annum discount, receiving payment partly in cash and partly in the notes of the partnership. The petitioner continued to do a small amount of financing. One of the reasons for forming the partnership was to avoid the restrictions of a Florida statute which prohibited automobile dealers from receiving insurance rebates. The restriction was removed in 1945 and the partnership was terminated in 1949 after which the petitioner resumed the financing of its sales. The partnership generally owed the petitioner money during the taxable years. The average ranged from a high of $90,680.32 in 1944 to a low of $1,821.95 in 1945. The Ford Motor Company insisted in 1948 that the petitioner carry on its Lincoln-Mercury *146 business at a location separate and apart from its Ford business. The petitioner then bought a lot for approximately $24,000 and was about to erect a building thereon to house its Lincoln-Mercury business when the Ford Motor Company disapproved the property. Keeter bought the property from the petitioner in 1949. The Gainesville Lincoln Mercury Motor, Inc., was formed in 1948 to take over the Mercury and Lincoln franchises then held by the petitioner because the latter was unwilling to incur the expenses incident to handling the Lincoln-Mercury business as a separate enterprise and without outside help, despite the fact that the Lincoln franchise had been profitable for a number of years. The outstanding stock of the new corporation was owned 250 shares by a Fred Hazen and his wife, 249 shares by the petitioner, and 1 share by Keeter. The petitioner's capital investment therein was $24,900. The petitioner helped Lincoln Mercury Motor, Inc. get started by extending it credit in the early part of its existence. Notes received by Lincoln Mercury Motor, Inc. from its customers on the sale of automobiles were sold to the petitioner, which either financed the paper itself or transferred *147 it to the partnership for financing. The petitioner purchased $33,348.57 of such notes from Lincoln Mercury Motor, Inc. in 1948. The petitioner has leased since 1930 the property where its showroom and service shop are located. The property has been occupied under ten-year leases since that time, the last renewal having been executed in June, 1949, for the period August 1, 1950, to July 31, 1960. The petitioner had no assurance prior to June, 1949, that it could obtain a new lease. The part of the building housing the offices and showroom is approximately 100 feet by 62 feet in area and is 1 1/2 stories high, the half story being used as storage space. A one-story service shop 137 feet by 94 feet constitutes the remaining part of the structure. There is display space for two or three automobiles in the showroom. A used-car lot which the petitioner purchased in 1940 for $17,250 adjoins the property on one side. Two houses which were on the used-car lot when it was purchased were later moved onto two additional pieces of property which the petitioner acquired for that purpose in 1941. The houses were converted into apartments at a cost of approximately $8,600 and rented to the petitioner's *148 employees during the war years. A small warehouse was erected on the used-car lot in 1947 at a cost of approximately $4,000. A small structure about 12 feet by 20 feet was also on the used-car lot at the time of its purchase and was subsequently extended in depth by approximately 100 feet. Part of this building is used for storing parts and accessories and part of it is rented on a month-to-month basis. A second used-car lot was acquired in 1949 for $12,000. The petitioner first attempted in about 1936 to purchase property on which the showroom and service shop are located, and continued those efforts during the war. The owner of that property died in 1950 and the petitioner has since been negotiating with his heirs to purchase the property. The building space now occupied by the petitioner is inadequate for the purposes of its business. The petitioner purchased a lot and building in the center of Gainsville in 1950 for approximately $42,000. That property was acquired for use as a warehouse and truck repair shop and also as a possible building site for the future. The Ford Motor Company has not insisted since 1928 or 1929 that the petitioner erect a new building. The petitioner *149 has had no plans prepared for a new building. The territory served by the petitioner, Gainesville and the county in which it is located, has increased in population during the year 1930 through 1950 as follows: 1930
1940
1945
1950
Gainesville
10,465
13,757
15,236
26,577
Alachua County
34,365
38,607
38,245
56,717
Automobiles are purchased from the Ford Motor Company for cash, while parts and accessories may be obtained on 15 days credit. The petitioner generally provides its own cash for the purchase of automobiles; occasionally it borrows the cash from a bank. Automobile prices increased radically between 1940 and 1948. The petitioner was not a mere holding or investment company. The earnings and profits of the petitioner for its fiscal years ended October 31, 1944, through 1948 were not permitted to accumulate beyond the reasonable needs of the business. The petitioner was not formed or availed of during its fiscal years ended October 31, 1944, through 1948, for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation through the medium of permitting its earnings or profits *150 to accumulate instead of being divided or distributed. Opinion MURDOCK, Judge: The Commissioner concedes that the petitioner was not formed for the purpose mentioned in section 102 and was not a mere holding or investment company, but contends that the earnings and profits of the petitioner were permitted to accumulate beyond the reasonable needs of the business with the result that the petitioner was availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its earnings and profits to accumulate instead of being divided or distributed. See section 102 (a) and (c), Internal Revenue Code. The two principal stockholders would have incurred additional surtax liability in each year had the petitioner declared additional dividends. This raises a question of fact to be determined from all of the evidence. The taxable years were not normal years in the business of the petitioner. The early ones were war years in which the sales of new and used automobiles were almost negligible and, even in the later years, the manufacturer was not able to furnish nearly as many cars as the petitioner could have sold. Nevertheless, the *151 petitioner had a valuable franchise and it fully expected, during all of these years, that its business would expand over that enjoyed in the past, just as soon as the manufacturer would be able to supply sufficient cars. The population of the area and with it the number of prospective purchasers was increasing rapidly. The price of cars was increasing and it could be expected that more funds would be necessary to operate the business when cars became available. The manufacturer planned even greater sales activity in order to compete more successfully with its rivals as soon as production could be expanded. The business was highly competitive. The accumulations for each separate year must be considered in the light of these circumstances. The capital in the business at the beginning of 1944 was less than it had been at the beginning of 1941. The amount of capital stock remained constant. The approximate increases in earned surplus were $30,000 for 1944, $29,000 for 1945, $62,000 for 1946, $76,000 for 1947, and $60,000 for 1948. The total increase during the five years was about $227,000, a relatively large increase. Furthermore, although the other assets were obviously used in the *152 business, the uninvested cash and Government Bonds on hand in each year ranged from about $279,000 to $389,000. The question is whether the petitioner had any real reason for believing that this large amount of ready funds would be needed in the business as soon as the manufacturer could supply sufficient cars. Keeter honestly believed that it was necessary to retain in the business the surplus which was retained. He believed that a substantial amount of money would be needed to buy cars and parts as soon as they were available; the business would have to be expanded over what it had been in the past if he was to hold the Ford franchise; it might be necessary to buy or build additional facilities; and large amounts would be needed to finance the increased sales of new and used cars as soon as they became available. He not only testified to these beliefs, but minutes of directors' meetings during the taxable years in which he participated, probably dominated, record such beliefs. The principal building occupied by the business was rented. There was uncertainty as to whether it would continue to be rented or whether it might be purchased. Keeter had plans to purchase the property if *153 he could do so and he was also contemplating some building. Although he never estimated exactly how much the corporation would need, nevertheless, he thought it would need all it had and subsequent events proved that he was correct. One of the principal factors contributing to the past success of the business had been the practice of financing its own sales. A partnership was set up in 1941 and apparently did most of the financing required during the taxable years. But the evidence is that Keeter, after he learned of the change in the law which obviated the necessity for the partnership, intended to discontinue the partnership and have the corporation do its own financing. That was actually done in the next fiscal year. He knew that as soon as sales increased, he would need large amounts for financing of the amounts which customers would owe him for cars purchased. Its notes and accounts receivable, for example, increased from about $118,000 at the end of 1948 to about $525,000 on January 1, 1951. These were all legitimate business objectives and the petitioner was justified in accumulating whatever funds might reasonably be necessary. It is quite clear that the earnings accumulated *154 in the first three taxable years were well within the reasonable needs of the business. The surplus on hand at the end of each of the next two years was substantially larger, but even as to this the evidence indicates a reasonable need within the business even though it was obviously nearer the maximum which might be regarded as reasonable. Decision will be entered under Rule 50.